UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**JUDGE KARAS**

------------------------------------------------------X

49 WB, LLC,

**0 8 CIV. 5784**

Plaintiff,

-against-

**COMPLAINT**



VILLAGE OF HAVERSTRAW, VILLAGE OF
HAVERSTRAW BOARD OF TRUSTEES,
FRANCIS J. "BUD" WASSMER,
FRANCISCO BATISTA, RAFAEL BUENO,
MICHAEL KOHUT, EVELYN RODRIGUEZ, and
JOHN DOE AND JANE DOE 1-20,

08 CV

**JURY TRIAL**
**DEMANDED**

Defendants.

------------------------------------------------------X

## NATURE OF THE ACTION

1.      This action is brought pursuant to the Fifth and Fourteenth Amendments
to the United States Constitution, the Civil Rights Act, 42 U.S.C. §§1983, 1985, and
1988, and Article I, Sections 6 and 7 and Article IX, Section 1(e) of the New York State
Constitution to recover money damages in compensation for the Defendants'
unconstitutional abuse of governmental process and powers. The Defendants violated the
Plaintiff's constitutional rights by abusing the power of eminent domain to inflict harm
upon the Plaintiff, to seize the Plaintiff's private property and transfer it to private parties,
and to otherwise use its governmental powers to confer a private benefit upon private
parties at the expense and to the detriment of the Plaintiff, all under the guise and pretext
of advancing a non-existent and pretextual public purpose.

2.      The issue of whether the Defendants' actions herein constituted an
impermissible and unconstitutional pretext to convey a private benefit on private parties

4.     The Defendants used and abused their powers of eminent domain so often, egregiously and freely, without apparent consequence, that the current Mayor even once remarked how "cool" it would be to take the Plaintiff's property, hold onto it during a rising market, then sell it for a profit.

5.     As a result of all the foregoing acts, the Plaintiffs has been irreparably harmed and will continue to be irreparably harmed unless and until an injunction is issued and other appropriate relief provided.  The Plaintiff therefore also brings this action to permanently enjoin the Defendants from again abusing their powers of eminent domain to benefit private parties and acting in violation of the Constitution in regard to Plaintiff's property and all others situated in the Village of Haverstraw.

## JURISDICTION AND VENUE

6.     This action is brought pursuant to the Fifth and Fourteenth Amendments to the United States Constitution; the Civil Rights Act, 42 U.S.C. §§ 1983, 1985, and 1988; and Article I, Sections 6 and 7 and Article IX, Section 1(e) of the New York State Constitution.

7.     This Court has jurisdiction under 28 U.S.C. § 1331, in that claims are asserted under the laws of the United States, and under 28 U.S.C. § 1343(a), in that claims are asserted under laws providing for the protection of civil rights. This Court has supplemental jurisdiction over Plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367.  Plaintiff also seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

8.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff' claims occurred in this district.

17.    Upon information and belief, when each of the foregoing individual Defendants took office, each swore to uphold the Constitutions of the United States of America and the State of New York, and were thereafter under the duty to faithfully execute the duties of their respective offices for the public good in accordance with law, not to act for the purpose of benefiting certain favored private parties at the expense and to the detriment of others.

18.    Various other persons are not named as Defendants herein (but referred to as "John Doe and Jane Doe 1-20" since their identity is yet to be definitively ascertained for pleading purposes) participated as co-conspirators with the Defendants in the violations set forth below, and performed overt acts in furtherance of the scheme to deprive Plaintiff of its legal rights.

## FACTS

19.    The Village impermissibly used and abused its power of eminent domain to legislatively transform Housing Opportunity for Growth, Advancement and Revitalization, Inc. ("HOGAR"), an entity headed by Ms. Edna Rivera, from tenant to owner of Plaintiff's private property, after HOGAR was unsuccessful in its own private efforts to do so, and to confer a private contractual benefit upon a private developer, Ginsburg Development Company, in the form of an affordable housing credit, all in derogation of its statutory authority and in violation of the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Sections 6 and 7 and Article IX, Section 1(e) of the New York State Constitution.

A.    The Plaintiff's Property

20.    The building at issue, presently owned by Plaintiff, is located at 49 West Broad Street in the Village of Haverstraw.  It was built in 1977 as a two-story structure and until purchased by Plaintiff in 2005, was owned by Graziosi Realty, LLC, a limited liability company owned by a local physician, Dr. Graziosi (hereinafter referred to collectively as "Graziosi").  The building contains a professional medical office on the first floor and offices on the second floor.

21.    Graziosi listed the building for sale in approximately 1999.  As set forth more fully below, HOGAR, began renting space in the building for its offices starting in 2002.

B.    Ginsburg's Waterfront Redevelopment Project

22.    In July, 1999, Mr. Martin Ginsburg, the principal of a large scale developer known as Ginsburg Development Company (hereinafter collectively referred to as "Ginsburg"), proposed a public/private redevelopment project for the downtown waterfront area of the Village.  Shortly thereafter, with the support Mayor Bud Wassmer and the Village Board, the plan evolved and came to include the development of a total of approximately 850 multi-family market rate housing units on the waterfront selling for in excess of $650,000 per unit (the "Waterfront Redevelopment Project").

23.    A series of resolutions were passed by the Village Board starting November 19, 1999 up through and including April 9, 2002, permitting the development of the waterfront area to go forward.

24.    Shortly after the project was proposed, the Village Board and Mayor Wassmer formed a "partnership" with Ginsburg and became committed to and politically

vested in his redevelopment plan, as confirmed in an April 9, 2002 Resolution passed by the Village Board.

25.    Mayor Wassmer, the Village Board, and Ginsburg memorialized their partnership in a contract entitled the Land Acquisition and Disposition Agreement (hereinafter referred to as the "LADA").

26.    From its inception, the project spurred outcries that the luxury redevelopment would result in the gentrification of the Village, with some claiming that higher income and caucasian residents would displace lower income and minority residents, including particularly those of Hispanic descent, from the development zone and Village.

27.    In an effort to appease the political outcry regarding gentrification, the Defendants agreed that Ginsburg would provide two "affordable housing" components in connection with the overall project: (1) a small percentage of the Project Housing Units were to be affordable and (2) Ginsburg was to "facilitate" the creation of scattered "Additional Affordable Units" outside of the project area but within the Village.

28.    Mayor Wassmer and the Village Board had at all relevant times a vested political interest in seeing to it that their "partner," Ginsburg, could and would satisfy his contractual obligations to provide the Additional Affordable Units in the Village to avoid the political fallout that would ensue were the obligation not met.

C.    <u>HOGAR's involvement and the Village's promise to deliver the Graziosi Building</u>

29.    The outcry of gentrification nevertheless continued, and HOGAR and Edna Rivera initially lead the charge. Village records confirm that HOGAR "brought [to] the attention of the [Village] Board that the [Ginsburg] waterfront project was going to

gone. Before it may be developed and its condemnation would have to be done at a greater cost, that's the rationale.

39.    At the public hearing, Edna Rivera admitted that she was competing with another private purchaser for a privately funded acquisition of the Graziosi building for HOGAR itself and actually went to contract with Dr. Graziosi for $820,000. Ms. Rivera then specifically set forth how and why she came to be asking the Village to condemn the property rather than going forward with the private purchase:

> We are in [an impasse] right now because at the last minute the doctor removed its contract. We are still negotiating with him. So, I wanted to put that on the record that we are willing to go forward. That we are hoping at all costs. Not because of our interest but because plainly it is a public meeting [sic]. There is a need for a supermarket in this area. We have proved it. We have committed surveys. We have handled all of the data, all of the reports. We are ready to purchase the building tomorrow. If he decided he wanted to sign the contracts, we can [go] forward on the deal tomorrow and we don't continue having [sic] an open communication with the attorneys. We hope that it will avoid condemnation proceedings. However, the agenda here is the pubic good. I believe you are taking the right step. Thank you.

40.    In other words, Edna Rivera explicitly admitted HOGAR wanted to acquire this property, but she was having difficulty negotiating the purchase privately with Dr. Graziosi. Accordingly, the Village willingly agreed to condemn or at least threaten to condemn the property to facilitate that private deal.

41.    At the same public hearing, then-Trustee Angelo Cintron correctly pointed out that the Village was improperly using the powers of eminent domain:

> If a supermarket can be put there by its' own strength, the open market, it's fine. I am 100% for it. But to use taxpayer's funds to buy a supermarket so we can stop Dr. Graziosi from making maybe a better deal or whatever deal he wants on the open market is wrong.

42.    The matter came back on before the Village Board at the February 2, 2004 meeting at which it was apparent that (a) the Village had been advised by condemnation counsel that use as a supermarket would not support the "public use" requirements in order to condemn the property, but (b) the Village did not want to abandon the threat of condemnation altogether given the existence of other private purchasers waiting in the wings to privately purchase the Graziosi building and foil the plan agreed upon to use eminent domain to facilitate HOGAR's acquisition of the property.

43.    The Village then concocted another potential public use to justify the continued improper threat of condemnation.  The Village Attorney stated at the next meeting:

> [Buying the Graziosi building to use as a Village Hall] is something that the Village Board now wants to take a look at.    I recommended to the Board that under those circumstances since we are only looking at these things, nobody's condemning anything.  Maybe it won't even be necessary to condemn a building since it can be purchased on a voluntary basis.

44.    The Board was advised by the Village attorney to continue the original public hearing for use as a supermarket (so the open hearing would still keep other buyers away), but to also schedule a new public hearing for its potential use as a Village Hall.

45.    Then-Trustee Cintron explicitly opposed continuing the public hearing for use as a supermarket and again pointed out that the Village was improperly abusing the powers of eminent domain, stating "that Dr. Grazoisi had his building for sale and lost the deal because of this condemnation.  So, we are getting involved in things that I am also afraid may lead to an Article 78 and get us into another lawsuit."

> I need to have some estimation to tell Graziosi's attorney
> how much longer he is going to hold off before he makes
> this more difficult than it is.

50.     During this same time period, one potential buyer, Mr. Louis Wu, actually

signed a contract of sale with Graziosi for a purchase price of approximately $840,000

with an $84,000 down payment.    Thereafter, he was told by Mayor Wassmer in a

personal meeting that the Village actually intended to acquire the building by eminent

domain and planned to move the Village Hall to that location, despite the fact that there

had been no decisions rendered at all in that regard and despite the fact that the entire

idea of condemning it for use as a Village Hall was nothing but a ruse to help HOGAR

acquire the property.    As a direct result of this intentionally false representation from

Mayor Wassmer, Mr. Wu, upon information and belief, walked away from the contract

and forfeited his entire down payment to Dr. Graziosi.    Thus, the Village succeeded in

keeping HOGAR alive as a potential purchaser at an artificially decreased price.

51.     At the Village Board's September 27, 2004 meeting, the continued abuse

of the condemnation powers by the Village Board as a ruse to assist HOGAR in acquiring

the property at an artificially decreased price was again clear.    The Village attorney

acknowledged that he had been negotiating with Dr. Graziosi's attorney at the direction

of the Board, but that:

> At a point in time, the board asked me to pull off.   In the
> meantime, Dr. Graziosi wants to know are we or are we not
> because he has had other offers for the building.   At this
> time, I would like the clarification from the board as to
> whether or not I should continue negotiating or not.

52.     Tellingly, Mayor Wassmer responded by abruptly stating as follows:

> Given my recent conversation with the County of
> Rockland, I recommend that we do not buy it at this time. I
> will entertain a motion to that effect.

53.    Thereafter, the minutes reflect that Resolution #384-2004 declining to

purchase the building was unanimously passed. This decision not to "buy" the building

from Graziosi was made only after speaking with the County, which ultimately is the

entity which provided financing to allow HOGAR to go forward the proposal ultimately

relied upon by the Defendants in their Determination and Findings (later annulled by the

Appellate Division). This resolution further establishes that Mayor Wassmer and the

Board were only using the idea of acquiring the building for use as a Village Hall and

"negotiating" privately with Dr. Graziosi as a ruse, since they immediately pulled out of

any negotiations once they learned that HOGAR was going to have the backing of the

County to purchase the property privately without the need for the Village's assistance.

54.    In the very next resolution on the same date, the Village attorney made

clear that the Village Board also knew that the negotiating ploy along with the threats of

condemnation had been artificially placing a stigma on the property (i.e., depressing the

price of the building). The Village attorney stated as follows:

> Can I have the board's further clarification that I can
> indicate to Dr. Graziosi that he is free to sell without
> casting the stigma of the condemnation.

55.    Yet, just three weeks later at their October 18, 2004 meeting, after

adjourning the meeting, the Village Board suddenly reconvened for the purpose of

adopting a brand new resolution suddenly coming up with yet another "public" use to

justify a condemnation of the Graziosi building, separate and apart from the prior aborted

"uses" previously identified.

60.     Mayor Wassmer was quoted in the October 20, 2004 edition of the Rockland Journal News as follows: "We prefer that this be a market deal between the buyer and the seller. But if that doesn't happen, we will get involved."

61.     The Village attorney, J. Nelson Hood, Sr., also made clear that the only way the Village would get involved "at all" is if HOGAR could come up with the financing itself. In that same October 20, 2004 article, Mr. Hood was quoted as follows: "If HOGAR does not have the wherewithal to purchase the building, the Village will not proceed with condemnation."

62.     After this resolution was passed, all other potential private purchasers for the property were again successfully scared off and, armed with this new leverage, HOGAR began negotiating again with Dr. Graziosi.

63.     In fact, according to HOGAR's lawyer, Dan Kraushaar, Esq., HOGAR then met with the Village Board and advised them to effectively "stand down" on condemnation. Mr. Kraushaar was quoted on behalf of HOGAR in a January 5, 2005 article in the Rockland Journal News as follows: "We have also met with the Village Board and told them at this juncture we are proceeding with an arms-length transaction with Dr. Graziosi and for them to abate their original plan to condemn the building by eminent domain," explicitly recognizing the self-evident fact that the Village's plan to use eminent domain to secure the property for HOGAR's private benefit would necessarily be the antithesis of an "arms-length transaction."

64.     However, by the February 7, 2005 meeting of the Village Board, HOGAR was again having difficulty in the negotiations and other potential purchasers were showing interest. Edna Rivera appeared at that meeting and, in the context of arguing for

a building moratorium to stop other proposed affordable housing projects in the Village, made the following stunning admission with respect to "our building that we planned to put in":

> **The most important thing is as we discussed during workshop session, you need to secure those opportunities for the people that you promised them [to], us [meaning HOGAR].**

65.    In other words, Edna Rivera implicitly admitted that the Village Board promised HOGAR the Graziosi building.

66.    Thereafter, HOGAR continued negotiating for a private acquisition of the building. Upon information and belief, Graziosi provided a contract to HOGAR for a purchase price of $865,000, but over a month after the contract was provided, HOGAR was still not able or willing to actually sign the contract.

67.    Given the unsuccessful negotiations between HOGAR and Graziosi, Mr. Patrick Lynch signed a contract to purchase the building on April 28, 2005 for $900,000.

68.    No sooner had that happened, then the Village made good on its promise to HOGAR and again renewed the illegal threats of condemnation to attempt to scare off Mr. Lynch and to convince him to walk away from his contract, just as the other parties had done under the threats of condemnation, and on June 6, 2005 a resolution was passed as follows:

> … I would like to make a resolution whereby the Village supports HOGAR's efforts to provide affordable housing in the entire community as well as more specifically her seeking to develop the Graziosi building on West Broad Street for affordable housing and hopefully a medical center as well. So, I would like to put that in a form of a resolution, which the clerk would forward onto HOGAR.

69.    Unlike the other purchasers who buckled under the unconstitutional threats of condemnation, Mr. Lynch stood up for his constitutional rights, formed the Plaintiff, 49 WB, LLC, assigned the contract to it, and Plaintiff then took title to the property at the closing on June 27, 2005.

70.    With the property now having changed hands from Graziosi to Plaintiff, Mayor Wassmer and the Village Board were now faced with the possibility that the new owners would have plans of their own for the building which would render impossible the scheme they had developed over the prior six years to assure that HOGAR would become the owner of the building and Ginsburg could use it to satisfy his affordable housing obligation.  Without even contacting Plaintiff to ascertain if its future use of the property was co-existential with the Village's alleged desires for affordable housing, etc., the Village made good on its threat of condemnation in an unconstitutional effort to take Plaintiff's private property and give it to HOGAR.

71.    Accordingly, just eleven days after the closing between Plaintiff and Graziosi, the Village issued its July 8, 2005 Public Hearing Notice scheduling a public hearing for the proposed condemnation of the building for July 25, 2005, without even so much as mentioning it in any public meeting prior to that.

72.    Had the Village been acting in good faith in this condemnation proceeding, and if the dominant purpose of the condemnation were truly to serve the public interest instead of HOGAR and Ginsburg, it is fundamental that the Defendants would have at least inquired as to the new owner's plans for the building to see if there remained any actual public need for the project HOGAR was proposing, or whether the new owner would be amenable to itself privately fulfilling any public need theretofore

identified. Of course, the immediate rush to start the condemnation without even inquiring as to Plaintiff's plans at that point clearly indicated that the Village was proceeding in a purposeful, unconstitutional, bad faith, unreasonable, and palpably improper effort to confer a private benefit upon HOGAR by transforming it from tenant to owner and upon Ginsburg by helping it to satisfy its contractual obligations in which the Defendants had a vested political interest.

E.    The Village's Condemnation Proceedings

73.    On July 25, 2005, August 15, 2005, September 6, 2005, and September 19, 2005, pursuant to the aforesaid notice, public hearings were held on the question of the proposed acquisition and project, during which HOGAR presented its purported plan to support the condemnation and Plaintiff appeared, presented its own private plans for the property, and objected to the proposed condemnation, on the grounds that the dominant purpose of the proposed condemnation was to confer a private benefit.

HOGAR's plan

74.    HOGAR, as the protagonist of the Village's plan to take Plaintiff's property, presented its plans at the public hearing. It was made clear that HOGAR sought to be transformed from the tenant to the property owner, so that it may enjoy all the rights attendant thereto, including quite importantly the economic benefit of owning a piece of property which would now be free and clear of the value-suppressing rumors of condemnation.

75.    HOGAR also planned to (1) lease a portion of the premises to a non-profit health care organization such as Hudson River Community Health Organization, (2) continue occupying a portion of the space itself, and (3) create "affordable" housing in

the form of condominium units available for one time sale, with the profits from those

sales going to HOGAR itself to help finance HOGAR's acquisition of the building.

76.　　In order to obtain acquisition and construction funds, HOGAR intended to

borrow $2.4 million from other public agencies, who would assume a portion of the debt,

and Ginsburg was to pay $180,000 in return for receiving credits for its off-site

affordable housing obligation under the LADA.

Plaintiff's Plans

77.　　Plaintiff presented its plan to put the property to the same use at no cost to

the public. Plaintiff purchased the property with the plan to (1) lease the medical offices

to a non-profit health care organization, such as Hudson River Community Health

Organization in order to bring low cost, accessible health care to the Village, (2) continue

leasing to HOGAR so as to ensure that HOGAR may keep its offices in the building into

the foreseeable future as it wished, and (3) create affordable housing in the form of

regenerative below market value rental units.

78.　　Plaintiff planned to do all of the foregoing privately, with private funds

and made this clear at the public hearing.

F.　　The Village's Determination and Findings

79.　　On November 29, 2005, the Defendants adopted a Resolution setting forth

and adopting their Determination and Findings pursuant to EDPL §204, and on or about

December 18 and 19, 2005, Defendants caused to be published a brief synopsis of their

Determination and Findings in this matter.

80.　　As set forth in the conclusory and sparse Determination and Findings as

memorialized in the November 29, 2005 Resolution adopting them, the Defendants

determined and found that the public use, benefit or purpose to be served by the proposed project was to (1) provide a community outreach health center, (2) provide a suitable location for "the Village=s [sic] designated affordable housing/neighborhood preservation corp.", and (3) serve as an appropriate site for up to 16 affordable housing units.

81.    In regard to serving the public purposes identified by the Village as its justification for the proposed condemnation, Plaintiff's plans and HOGAR's plans for the property are nearly identical.

82.    The Determination and Findings did not even so much as identify or acknowledge Plaintiff's plans for the building, let alone explain, justify, analyze, or even mention the basis for going forward with condemnation and the use of public dollars to do so, when the very same public purpose they identified would be served at least as well, if not better, if the Village simply did nothing.

G.    Plaintiff's Petition Pursuant to EDPL §207 Challenging the Condemnation as Unconstitutional

83.    On or about January 17, 2006, the Plaintiff herein filed a Petition pursuant to EDPL §207 in the New York State Supreme Court, Appellate Division, Second Department, challenging the Determination and Findings on the ground that, among other things, the Village was exercising its power of Eminent Domain in an illegal and unconstitutional manner, seeking to convey a private benefit upon private parties, rather than acting in furtherance of a public benefit, use, or purpose as required under the EDPL and the New York State and United States Constitutions.

84.    Plaintiff argued in its Petition that the Defendants did not act for any public purpose at all; rather, they acted to take Plaintiff's private property solely for the

purpose of conveying a private benefit to HOGAR and Ginsburg and for their own political benefit. Mayor Wassmer and the Village Board had a vested political interest in seeing to it that Ginsburg gets his credit for the affordable housing, and concomitantly, in seeing to it that HOGAR acquired this property, not Plaintiff.

85.    In support of the Petition, Plaintiff argued, among other things, as follows:

(a)    The fact that the notice of public hearing on the proposed condemnation went out just 11 days after the Plaintiff's closing, without the Village even asking the new owner what its plans were for the building, indicated that the Village simply did not care what use was proposed by the new owner, since the Village had pre-ordained that the condemnation would go forward in order to execute the plan which had developed over the prior years to convey the planned private benefit upon HOGAR and Ginsburg in the guise and under the pretext of a "public purpose."

(b)    The Village made clear during the hearings that the only circumstance under which the Village would even remotely consider exercising its powers of eminent domain is if HOGAR itself guaranteed that it would finance this entire condemnation with up-front money, and the Village would then hand HOGAR the title.

(c)    Ms. Edna Rivera admitted that HOGAR moved to the building four years earlier with the specific intent to purchase it and develop it, but despite many efforts, was never able to accomplish this in the private real estate market, and that the Village was seeking to abuse its powers of eminent domain to allow HOGAR to do what it was unable to do privately.

(d)    The Village also conferred a private benefit to its political partner, Ginsburg, in that Ginsburg agreed to contribute $180,000.00 to HOGAR's buy-back of the property from the Village, and in return, Ginsburg would receive credit under its contract for a very large percentage of the required affordable housing units.

(e)    If the goal had truly been to provide more affordable housing, the Village's actions were actually self-defeating, as the effect of the condemnation would have been to reduce, rather than add to the available affordable housing in the Village. If the condemnation did not go forward, Plaintiff would create affordable housing and Ginsburg would be required to provide additional affordable housing elsewhere in the Village pursuant to his contractual obligations under the LADA, but conversely, if the condemnation did go forward, Plaintiff did not intend to re-invest elsewhere in the Village and would not create any

affordable housing. Thus, the condemnation would have assured <u>less</u> affordable housing would be created.

H.    The Appellate Division Held that the Defendants Acted for the Sole purpose of <u>Benefitting Private Parties at the Expense of the Plaintiff</u>

86.    On June 19, 2007, the Appellate Division, in a twenty page decision authored by the Hon. Mark C. Dillon, J.S.C., granted the Petition insofar as it sought to annul the Determination and Findings. The Court found that each of the three alleged public purposes identified by the Defendants in the Determination and Findings were "illusory" and that the "Village's justification for the condemnation, that it serves a public use, benefit, or purpose, is merely pretextual, and, hence, improper." The Court went on to hold that the Village's "true purpose for the condemnation" was to benefit private parties, HOGAR and Ginsburg, and that Plaintiff met its heavy burden of establishing that the Determination and Findings "do not rationally relate to a conceivable public use, benefit, or purpose," setting forth as follows:

> The Village's assistance to Ginsburg and HOGAR was to be accomplished at the expense of 49 WB's right to its continued ownership, use, and enjoyment of its private property.

87.    The Defendants did not appeal from this decision, and the time to do so has expired. It is, therefore, res judicata.

88.    Upon information and belief the Defendants used their power, public office, public property, public personnel, public funds, and confidential information acquired by them in the course of their official duties for the purpose of securing benefits and privileges for private third-parties.

89.    Upon information and belief, the Defendants' aforementioned conduct raises suspicion among the public that they are likely to be engaged in acts that are in violation of trust and presents the hazard of abuse of office.

90.    Upon information and belief, the Defendants acted with the intent and purpose of using their position and powers to promote the financial well-being, financial gain, publicity and/or benefit of private third-parties.

91.    Upon information and belief, the municipal Defendants used their positions, offices, and powers to promote the financial well-being, financial gain, publicity, and/or benefit of private third-parties.

92.    Upon information and belief, the municipal Defendants' conduct as aforesaid is part of a persistent and/or widespread practice which constitutes Defendants' custom or usage with the force of law.

93.    Upon information and belief, the aforesaid conduct was proximately caused by the municipal Defendants' failure to train, supervise and/or adequately supervise its officials and employees.

94.    In taking all actions alleged in this Complaint, Defendants acted intentionally, gross negligently, and with deliberate indifference to the Plaintiff's federally protected civil rights and pursuant to a formally adopted policy.

95.    As a result of the Defendants' aforesaid conduct, Plaintiff has suffered and continues to suffer the effects of Defendants' violation of his constitutional rights and has been harmed thereby, in that, among other things, the value of Plaintiff's property has been caused to diminish by the improper and illegal value-suppressing threats to condemn and actions taken by the Defendants in furtherance of the condemnation of

Plaintiff's property, the Plaintiff was caused to lose the full use and enjoyment of its property, has lost rental income, has been caused to continue paying taxes, insurance, and all other carrying costs throughout the period of the Defendants' illegal and abusive actions directed at his property specifically, has been caused to incur other costs, disbursements, and attorneys' fees, and has suffered other damages as a result of the Defendants' conduct as alleged herein.

## AS AND FOR A FIRST CAUSE OF ACTION

96.    Plaintiff restates, as if fully rewritten herein, each and every relevant claim, allegation and assertion set forth in Paragraphs "1" through "95" of this Complaint.

97.    The Fifth and Fourteenth Amendments of the United States Constitution guarantee all persons, including the Plaintiff, due process of law.

98.    The foregoing constitutes clearly established statutory or constitutional rights of which a reasonable person, and the Defendants, would have known.

99.    Defendants improperly employed and used the power and process of eminent domain against Plaintiff, 49 WB, LLC, in order to obtain a collateral objective and for private benefit that is outside the legitimate ends of the process.

100.    Defendants improperly interfered with Plaintiff's property rights through a series of actions under the fraudulent representation and pretext of serving a public use, benefit or purpose, but actually designed for private benefit of themselves and private third parties.

101.   By reason of the foregoing, Defendants have violated and continue to violate the rights of the Plaintiff under the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §1983.

102.   In taking all actions alleged in this Complaint, Defendants acted under color of state law, pursuant to a formally adopted policy, and with deliberate indifference and/or callous indifference to the Plaintiff's federally protected rights.

103.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered a distinct and actual injury to his civil rights.

### AS AND FOR A SECOND CAUSE OF ACTION

104.   Plaintiff restates, as if fully rewritten herein, each and every relevant claim, allegation and assertion set forth in Paragraphs "1" through "103" of this Complaint.

105.   Article I, Section 6, of the New York State Constitution guarantees all persons, including the Plaintiff, due process of law.

106.   The foregoing constitutes clearly established statutory or constitutional rights of which a reasonable person, and the Defendants, would have known.

107.   Defendants improperly employed and used the power and process of eminent domain against Plaintiff, 49 WB, LLC, in order to obtain a collateral objective and for private benefit that is outside the legitimate ends of the process.

108.   Defendants improperly interfered with Plaintiff's property rights through a series of actions under the fraudulent representation and pretext of serving a public use, benefit or purpose, but actually designed for private benefit to themselves and private third-parties.

116.   Where the condemnation of property is judicially rejected by the New York State courts, the Plaintiff has no adequate remedy at state law and no opportunity under state law to raise his federal constitutional claims or seek damages.

117.   By reason of the foregoing, Defendants have violated and continue to violate the rights of the Plaintiff under the Fifth Amendment of the United States Constitution and 42 U.S.C. §1983.

118.   In taking all actions alleged in this Complaint, Defendants acted under color of state law, pursuant to a formally adopted policy, and with deliberate indifference and/or callous indifference to the Plaintiff's constitutionally protected rights.

119.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered a distinct and actual injury to his civil rights.

## AS AND FOR A FOURTH CAUSE OF ACTION

120.   Plaintiff restates, as if fully rewritten herein, each and every relevant claim, allegation and assertion set forth in Paragraphs "1" through "119" of this Complaint.

121.   Article I, Section 7(a) of the New York State Constitution provides that "[p]rivate property shall not be taken for public use without compensation".

122.   The foregoing constitutes clearly established statutory or constitutional rights of which a reasonable person, and the Defendants, would have known.

123.   Defendants have effected a "taking" without just compensation in violation of the New York State Constitution. The Plaintiff has suffered from condemnation blight, diminution in rental and property value due to the cloud of impending condemnation, as well as a loss of use of the subject property due to

Defendants' bad faith and improper use of the state condemnation law in order to benefit themselves and private third-parties.

124.   By reason of the foregoing, Defendants have violated and continue to violate the rights of the Plaintiff under Article I, Section 7(a) of the New York State Constitution.

125.   In taking all actions alleged in this Complaint, Defendants acted under color of state law, pursuant to a formally adopted policy, and with deliberate indifference and/or callous indifference to the Plaintiff's constitutionally protected rights.

126.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered a distinct and actual injury to his civil rights.

## AS AND FOR A FIFTH CAUSE OF ACTION

127.   Plaintiff restates, as if fully rewritten herein, each and every relevant claim, allegation and assertion set forth in Paragraphs "1" through "126" of this Complaint.

128.   The Defendants acted in concert, agreed and conspired to deprive Plaintiff of his rights under the Fifth and Fourteenth Amendments of the United States Constitution, in breach of 42 U.S.C. §§ 1983 and 1985.

129.   As a direct and proximate result of Defendants' conduct, Plaintiff has been injured and continues to suffer a distinct and actual injury to his civil rights.

## AS AND FOR A SIXTH CAUSE OF ACTION

130.    Plaintiff restates, as if fully rewritten herein, each and every relevant claim, allegation and assertion set forth in Paragraphs "1" through "129" of this Complaint.

131.    The Defendants, by their acts, have conspired and continue to conspire, in breach of 42 U.S.C. §§ 1983 and 1985 (3), to abridge the rights of Plaintiffs to Equal Protection to protect their property interests under the law in violation of the Fourteenth Amendment to the Constitution of the United States.

## DEMAND FOR JURY TRIAL

132.    The Plaintiff demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands Judgment as follows:

A.      For a judgment declaring Defendants' actions unconstitutional as set out in the First, Second, Third, Fourth, Fifth, and Sixth Causes of Action;

B.      For a judgment awarding compensatory damages against the Defendants, jointly and severally, in an amount to be determined at trial, but in no event less than $5,000,000.00;

C.      For a judgment awarding punitive damages against the individual Defendants in an amount to be determined at trial, but in no event less than $5,000,000;

D.      For an award of attorney's fees and costs pursuant to 42 U.S.C. § 1988;

E.      For a judgment granting permanent injunctive relief enjoining the Defendants from using their powers of eminent domain to benefit private parties; acting in violation of the Constitution in regard to Plaintiff's property and all others situated in the Village of Haverstraw; and, otherwise interfering with Plaintiff's Constitutional rights in the future; and,

F.        For such other and further relief as this Court may deem just and proper.

Dated: South Nyack, New York
         June 25, 2008

                              Respectfully submitted,

                              FEERICK LYNCH MACCARTNEY PLLC

                              By: J. David MacCartney, Jr. (JDM 5650)
                              Attorneys for Plaintiff
                              96 South Broadway
                              South Nyack, New York 10960
                              (845) 353-2000

Westlaw.

44 A.D.3d 226

44 A.D.3d 226, 839 N.Y.S.2d 127, 2007 N.Y. Slip Op. 05506

(Cite as: 44 A.D.3d 226, 839 N.Y.S.2d 127)

C

49 WB, LLC v. Village of Haverstraw

N.Y.A.D. 2 Dept.,2007.

Supreme Court, Appellate Division, Second Department, New York.

In the Matter of 49 WB, LLC, petitioner,

v.

VILLAGE OF HAVERSTRAW, et al., respondents.

June 19, 2007.

**Background:** Condemnee commenced proceeding for review of a determination of village's board of trustees authorizing the condemnation of non-blighted private property for public use.

**Holdings:** The Supreme Court, Appellate Division, Dillon, J., held that:

(1) as a matter of first impression, 30-day statute of limitations for filing petition for judicial review of condemnor's determination and findings began to run when village completed its additional, voluntary publications beyond minimum two publications;

(2) the condemnation did not serve a public use, benefit, or purpose, as needed to justify exercise of eminent domain power; and

(3) condemnee was not entitled to an award of reasonable fees for attorneys, appraisers, and experts, plus costs and disbursements actually incurred because of an acquisition procedure.

Petition granted in part and denied in part.

West Headnotes

**[1] Eminent Domain 148 €─198(1)**

148 Eminent Domain

 148III Proceedings to Take Property and Assess Compensation

  148k198 Hearing and Determination as to Right to Take

   148k198(1) k. In General. Most Cited

Cases

As a matter of first impression, 30-day statute of limitations for filing petition for judicial review of condemnor's determination and findings authorizing condemnation of non-blighted private property for public use began to run when village completed its publications after five successive days, although statute required publication only in at least two successive newspaper issues; village's publication beyond the two-issue minimum, though voluntary, was not completed until its last publication. McKinney's EDPL §§ 204(A), 207(A).

**[2] Statutes 361 €─190**

361 Statutes

 361VI Construction and Operation

  361VI(A) General Rules of Construction

   361k187 Meaning of Language

    361k190 k. Existence of Ambiguity.

Most Cited Cases

**Statutes 361 €─216**

361 Statutes

 361VI Construction and Operation

  361VI(A) General Rules of Construction

   361k213 Extrinsic Aids to Construction

    361k216 k. Motives and Opinions of

Legislators. Most Cited Cases

Statutes are to be interpreted in accordance with their plain and unambiguous meaning, without regard to expressions of hope or understanding that may be at odds with those expressed terms.

**[3] Statutes 361 €─181(1)**

361 Statutes

 361VI Construction and Operation

  361VI(A) General Rules of Construction

   361k180 Intention of Legislature

    361k181 In General

     361k181(1) k. In General. Most

Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

44 A.D.3d 226                                                                    Page 2
44 A.D.3d 226, 839 N.Y.S.2d 127, 2007 N.Y. Slip Op. 05506
(Cite as: 44 A.D.3d 226, 839 N.Y.S.2d 127)

**Statutes 361 ☞188**

361 Statutes
   361VI Construction and Operation
     361VI(A) General Rules of Construction
      361k187 Meaning of Language
       361k188 k. In General. Most Cited Cases
A court's primary purpose in interpreting a statute is to ascertain and give effect to the intent of the Legislature, and the best evidence of that intent is the plain wording of the statute itself.

**[4] Eminent Domain 148 ☞198(1)**

148 Eminent Domain
   148III Proceedings to Take Property and Assess Compensation
     148k198 Hearing and Determination as to Right to Take
      148k198(1) k. In General. Most Cited Cases
The first and most obvious purpose of the publication requirement regarding notice of 30-day review period for challenging public use determination is to assure notice of the condemnor's determination and findings to all persons who may seek to challenge the acquisition of property through the judicial process. McKinney's EDPL § 204(A).

**[5] Eminent Domain 148 ☞198(1)**

148 Eminent Domain
   148III Proceedings to Take Property and Assess Compensation
     148k198 Hearing and Determination as to Right to Take
      148k198(1) k. In General. Most Cited Cases
The second purpose served by requirement that determination and findings authorizing condemnation of non-blighted private property for public use be published is to fix a date from which to measure the condemnees' 30-day statute of limitations. McKinney's EDPL §§ 204(A), 207(A).

**[6] Eminent Domain 148 ☞17**

148 Eminent Domain
   148I Nature, Extent, and Delegation of Power
     148k16 Particular Uses or Purposes
      148k17 k. In General. Most Cited Cases
Village's condemnation of non-blighted private property for public use did not serve a public use, benefit, or purpose, as needed to justify exercise of eminent domain power, where alleged public purposes of the condemnation, regarding a community health center, office space for village's designated affordable housing and neighborhood preservation not-for-profit organization, and construction of affordable housing for local residents and volunteers, were illusory, since condemnee had already leased a portion of the premises to a dentist and had undertaken with state and local agencies to introduce a community health network into the site, organization's officers were already present within the premises, and by exercising eminent domain, village achieved fewer affordable housing units for its residents and volunteers, whereas by not condemning the site, village would realize a greater number of affordable housing units. McKinney's EDPL § 207(C)(4).

**[7] Eminent Domain 148 ☞13**

148 Eminent Domain
   148I Nature, Extent, and Delegation of Power
     148k12 Public Use
      148k13 k. In General. Most Cited Cases

**Eminent Domain 148 ☞69**

148 Eminent Domain
   148II Compensation
     148II(A) Necessity and Sufficiency in General
      148k69 k. Necessity of Making Compensation in General. Most Cited Cases
Generally, the power of eminent domain, as standardized by statute, may be exercised to take private property as long as there is a legitimate public purpose to the taking, and just compensation is paid to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

44 A.D.3d 226                                                                                          Page 3
44 A.D.3d 226, 839 N.Y.S.2d 127, 2007 N.Y. Slip Op. 05506
(Cite as: 44 A.D.3d 226, 839 N.Y.S.2d 127)

the owners for their properties. U.S.C.A.
Const.Amend. 5; McKinney's Const. Art. 1, § 1;
McKinney's EDPL § 101.

**[8] Eminent Domain 148 ☞13**

148 Eminent Domain
　　148I Nature, Extent, and Delegation of Power
　　　　148k12 Public Use
　　　　　　148k13 k. In General. Most Cited Cases
What qualifies as a "public purpose" or "public
use" needed to justify exercise of eminent domain
power is broadly defined as encompassing virtually
any project that may confer upon the public a bene-
fit, utility, or advantage.

**[9] Eminent Domain 148 ☞66**

148 Eminent Domain
　　148I Nature, Extent, and Delegation of Power
　　　　148k65 Determination of Questions as to
Validity of Exercise of Power
　　　　　　148k66 k. Jurisdiction of Courts in Gener-
al. Most Cited Cases
Whether a use to which property is to be devoted
by a condemnor is, in fact, for the public benefit, as
needed to justify exercise of eminent domain
power, is a question to be determined by the courts
based on the record.

**[10] Eminent Domain 148 ☞68**

148 Eminent Domain
　　148I Nature, Extent, and Delegation of Power
　　　　148k65 Determination of Questions as to
Validity of Exercise of Power
　　　　　　148k68 k. Conclusiveness and Effect of
Exercise of Delegated Power. Most Cited Cases
While courts are required to be more than rubber
stamps in determining whether a taking furthers a
public use, as needed to justify exercise of eminent
domain power, a municipality's determination that
property is needed for a public purpose is regarded
as well-nigh conclusive and not a question of fact
for de novo determination; consequently, the scope
of any judicial review of condemnation determina-

tions must necessarily be narrow, as the exercise of
authority under condemnation statute is an essen-
tially legislative function that includes, as a funda-
mental component, the conduct of a public hearing.
McKinney's EDPL § 101 et seq.

**[11] Eminent Domain 148 ☞67**

148 Eminent Domain
　　148I Nature, Extent, and Delegation of Power
　　　　148k65 Determination of Questions as to
Validity of Exercise of Power
　　　　　　148k67 k. Conclusiveness and Effect of
Legislative Action. Most Cited Cases
A legislature's finding that a property condemnation
furthers a public use or purpose should be affirmed
unless it is without foundation in the hearing re- cord.

**[12] Eminent Domain 148 ☞196**

148 Eminent Domain
　　148III Proceedings to Take Property and Assess
Compensation
　　　　148k196 k. Evidence as to Right to Take.
Most Cited Cases
The burden of proof is on condemnee to establish
that the condemnor's determination and findings do
not rationally relate to a conceivable public pur- pose.

**[13] Eminent Domain 148 ☞61**

148 Eminent Domain
　　148I Nature, Extent, and Delegation of Power
　　　　148k60 Taking for Private Use
　　　　　　148k61 k. In General. Most Cited Cases
Eminent domain cannot be used as a mere pretext
for conferring benefits upon purely private entities
and persons.

**[14] Eminent Domain 148 ☞13**

148 Eminent Domain
　　148I Nature, Extent, and Delegation of Power
　　　　148k12 Public Use
　　　　　　148k13 k. In General. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

44 A.D.3d 226
44 A.D.3d 226, 839 N.Y.S.2d 127, 2007 N.Y. Slip Op. 05506
(Cite as: 44 A.D.3d 226, 839 N.Y.S.2d 127)

Page 4

**Eminent Domain 148 ⚖61**

148 Eminent Domain
   148I Nature, Extent, and Delegation of Power
      148k60 Taking for Private Use
         148k61 k. In General. Most Cited Cases
The existence of a public use, benefit, or purpose underlying a condemnation is a sine qua non to petitions for judicial review of a public use determination; however, the fact that an intended public use confers incidental benefit to private persons or entities will not invalidate the condemnation of private property. McKinney's EDPL § 207.

**[15] Eminent Domain 148 ⚖196**

148 Eminent Domain
   148III Proceedings to Take Property and Assess Compensation
      148k196 k. Evidence as to Right to Take. Most Cited Cases
Condemnees face significant hurdles in challenging condemnations based on alleged bad faith; there must be a clear showing in the record of bad faith, and mere allegations of bad faith and suspicious timing do not suffice.

**[16] Eminent Domain 148 ⚖265(5)**

148 Eminent Domain
   148III Proceedings to Take Property and Assess Compensation
      148k265 Costs, Fees, and Expenses
         148k265(5) k. Liability for Costs and Expenses on Abandoning Proceedings. Most Cited Cases
Village did not abandon vesting rights, as would entitle condemnee to an award of reasonable fees for attorneys, appraisers, and experts, plus costs and disbursements actually incurred because of an acquisition procedure, where village never commenced a vesting proceeding to obtain legal title to condemned property, and village had not been found within the context of a judicial vesting proceeding to be unauthorized to acquire the property. McKinney's EDPL §§ 103(A), 702(B).

**129 Feerick LynchMacCartney PLLC, South Nyack, N.Y. (J. David MacCartney of counsel), for petitioner.
Watkins & Watkins, LLP, White Plains, N.Y. (John E. Watkins, Jr., and Liane V. Watkins of counsel), for respondents.

HOWARD MILLER, J.P., ROBERT A. SPOLZINO, STEVEN W. FISHER, and MARK C. DILLON, JJ.

DILLON, J.
*228 The decision of the United States Supreme Court in *Kelo v. New London,* 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 has re-shaped, in certain respects, the concept of eminent domain. For the first time, the Supreme Court held that a municipality's taking of non-blighted private property by eminent domain, in furtherance of a plan for economic development that would be open for use by the general public, constitutes a permissible " public use" within the meaning of the Fifth Amendment of the Federal Constitution (*id.* at 487-490, 125 S.Ct. 2655). The five-judge majority in *Kelo* emphasized that nothing in its decision prevented states from placing restrictions upon the exercise of eminent domain specifically through state statutes or constitutional interpretations as to what qualifies as a " public use." *Kelo* was controversial at the time of its **130 issuance,[FN1] as it granted municipalities greater license to interpret the "public use" of its takings, subject to superior state law. Eminent domain may now represent a growth industry for litigation over the purported public uses which have formed the basis for takings of private property.

    FN1. No fewer than 17 bills were introduced in the New York State Legislature shortly after *Kelo* to protect property from government-aided developers. (*see* Caher, *'Kelo'-Related Bills Pass Senate Judiciary Body,* N.Y.L.J., May 3, 2006, at 2, col. 6). The New York State Bar Association called upon the Legislature to create a commission on eminent domain, to avoid a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"backlash" to the *Kelo* ruling (*see* Caher, *State Bar Backs Study to Moderate Post-'Kelo' Backlash,* N.Y.L.J., April 7, 2006, at 1, col. 3).

The instant petition may represent one of the earliest post-*Kelo* litigations in the State of New York. The issues are threefold and all appear to be, for us, questions of first impression: (1) regarding the timeliness of a petition seeking judicial review of a municipal determination and findings, whether the date from which the statute of limitations is measured runs from the minimum second date of publication of the determination and findings, as required by Eminent Domain Procedure Law (hereinafter EDPL) § 204(A), or from the completion of additional publications beyond the minimum under ED-PL 207(A); (2) assuming a timely petition, whether the municipal condemnor here exercised its eminent domain authority over private property in furtherance of a "public use" (EDPL 207[C][4] ), or as a mere pretext conferring a private benefit; and (3) whether the petitioner is entitled to an award of *229 attorneys' fees, costs, and disbursements under EDPL 702(B) if the condemnor's determination and findings are rejected by the reviewing court.

For reasons set forth below, we find that the petition in this instance was timely filed within the applicable statute of limitations. We also find that a condemnation of property should be judicially rejected where, as here, its ostensible purpose of providing affordable housing was a pretext to benefit private entities resulting in the creation of less affordable housing than if there had been no taking of property at all, and the taking does not rationally relate to any other public purpose. Finally, we find that under EDPL 702(B), the petitioner is not entitled to an award of legal fees, costs, and disbursements absent the condemnor's commencement or abandonment of proceedings under EDPL articles 4 through 6 to acquire vested title.

## I. *RELEVANT FACTS*

The "Graziosi Building" is a two-story building located in Rockland County at 49 West Broad Street in the Village of Haverstraw. At the time the petition was brought, the building consisted of a dental office on the first floor and vacant offices on the second floor. In July 1999, Ginsburg Development Company, Harbors Haverstraw, LLC, and related entities (hereinafter collectively referred to as Ginsburg), informally proposed to develop the downtown Haverstraw Hudson River waterfront through a "public/private redevelopment project." Thereafter, on April 9, 2002, the respondent Village of Haverstraw, through its Board of Trustees (hereinafter collectively the Village), adopted a resolution requiring Ginsburg to develop 40 affordable housing units within the Waterfront Development District, and to identify, rehabilitate, or construct approximately 85 additional scattered-site units that would provide affordable housing incidental to the revitalization of the downtown waterfront.

Graziosi Realty, LLC, which owned the Graziosi Building, had listed the property **131 for sale in 1999. Efforts to sell the property to Louis Wu in 2004 and to Housing Opportunity for Growth, Advancement and Revitalization, Inc. (hereinafter HOGAR), in 2005 were unsuccessful. The Graziosi Building was sold to the petitioner, 49 WB, LLC (hereinafter 49 WB), pursuant to a written contract dated April 28, 2005, with title passing to 49 WB on June 27, 2005.

HOGAR is the Village's designated affordable housing and neighborhood preservation not-for-profit organization, and is also a tenant of the Graziosi Building. While HOGAR, during *230 its tenancy at the Graziosi Building, had always intended to purchase and develop the property, HOGAR could not meet the financing requirements of various proposed purchase contracts.

Eleven days after 49 WB's purchase of the Graziosi Building, the Village published notice of a public hearing on its proposed acquisition of the property through eminent domain. Public hearings were conducted on four dates between July 25, 2005, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in at least two successive issues of a newspaper of general circulation." [FN2] The publication must occur within 90 days from the conclusion of the condemnor's public hearings (see EDPL 204[A]; *Matter of Legal Aid Socy. of Schenectady County v. City of Schenectady,* 78 A.D.2d 933, 934, 433 N.Y.S.2d 234).

> FN2. If an officially-designated newspaper is also one of general circulation in the locality, publication in such paper is sufficient (see EDPL 204[A] ).

While EDPL 204(A) requires publication of the determination and findings in at least two successive issues, the publication *232 in this matter appeared for five successive days, from December 15, 2005, to December 19, 2005.[FN3]

> FN3. When publishing the determination and findings for five days, the Village may have confused the publication requirements of EDPL 202 with those of EDPL 204(A). EDPL 202 requires that notice of public hearings for potential condemnations be published in at least five successive issues of an official or daily newspaper (see EDPL 202[A]; *Matter of W.C. Lincoln Corp. v. Village of Monroe,* 295 A.D.2d 440, 743 N.Y.S.2d 177). EDPL 204(A) requires, by contrast, that a determination and findings be published, with a synopsis, in at least two successive issues.

The Village and 49 WB measure the statute of limitations in two conflicting ways. The Village maintains that since EDPL 204(A) only requires publication in at least two successive issues, the requirements of the statute were "completed" upon publication on the second successive day, December 16, 2005, notwithstanding the unnecessary and voluntary publications that appeared in *The Journal News* for three days thereafter. In measuring the statute of limitations from December 16, 2005, the limitations period would expire 30 days later on January 15, 2006. We note that January 15, 2006, was a Sunday

and that the following day, January 16, 2006, was Martin Luther King, Jr., Day, thus extending the statute of limitations to Tuesday, January 17, 2006 (see General Construction Law §§ 24, 25[1] ). Under the Village's calculations, the filing of the petition on Wednesday, January 18, 2006, was untimely by one day.

**133 By contrast, 49 WB argues that judicial review of the condemnation under EDPL 207 was timely sought. It notes that EDPL 204(A) does not require publication of the determination and findings for "two days," but rather, for "at least" two days, allowing condemnors such as the Village to publish their legal notices for more than two days. Here, the Village's publications were not "completed" until the fifth day, December 19, 2005, as a result of which 49 WB argues that the filing of its petition on January 18, 2006, was timely. The issue of whether or not the statute of limitations is to be measured from the second day of publication, or from the completion of all successive publications, has not been addressed by prior decisional authority. It is also an issue that may be of importance to future challenges to the exercise of eminent domain.

We are persuaded that 49 WB's interpretation of EDPL 204(A) and 207(A) is correct and that the statute of limitations should be measured from the Village's completion of its publications on the fifth day. We base this conclusion on discrete aspects of the controlling statutory language.

[2][3] *233 Statutes are to be interpreted in accordance with their plain and unambiguous meaning, without regard to expressions of hope or understanding that may be at odds with those expressed terms (see *Matter of Briffel v. County of Nassau,* 31 A.D.3d 79, 85, 817 N.Y.S.2d 71, *affd.* 8 N.Y.3d 249, 832 N.Y.S.2d 862, 864 N.E.2d 1261; *Ragucci v. Professional Constr. Servs.,* 25 A.D.3d 43, 47, 803 N.Y.S.2d 139). Our primary purpose in interpreting the statute is to ascertain and give effect to the intent of the Legislature, and the best evidence of that intent is the plain wording of the statute itself (see

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Desiderio v. Ochs,* 100 N.Y.2d 159, 169, 761 N.Y.S.2d 576, 791 N.E.2d 941; *Riley v. County of Broome,* 95 N.Y.2d 455, 463, 719 N.Y.S.2d 623, 742 N.E.2d 98).

Here, the plain language of EDPL 204(A) does not limit the notice requirement to two actual successive newspaper issues. Instead, notice of the determination and findings must be published "in at least two successive [newspaper] issues" (EDPL 204[A] [emphasis added] ). The statute's inclusion of the words "at least" suggests that the Legislature envisioned that the publication span any number of days at the option of the condemnor, though never less than a two-issue minimum. Had the Legislature intended for the second day of publication to trigger the statute of limitations, it could have so declared, and there would have been no reason for the statute to include the language that publication be for "at least" two issues. The statutory language therefore vests the condemnor with the discretion to publish its notice in two successive issues, or for more than two days such as the five-day notice published by the Village here.

[4] There is more than one purpose served by the publication requirement of the EDPL. The first and most obvious purpose is to assure notice of the condemnor's determination and findings to all persons who may seek to challenge the acquisition of property through the judicial process (*see Brody v. Village of Port Chester,* 434 F.3d 121, 129). The right to challenge a determination and findings "has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest"(*Brody v. Village of Port Chester, supra* at 129, citing *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865). The means and content of the required notice, as defined by the EDPL, have passed constitutional scrutiny **134 (*see Matter of De Vito v. City of Troy,* 72 A.D.2d 866, 867, 421 N.Y.S.2d 719).

[5] The second purpose served by the requirement that the determination and findings be published is

to fix a date from which *234 to measure the condemnees' 30-day statute of limitations. In this regard, EDPL 207(A) expressly defines the statute of limitations as "thirty days after the *condemnor's completion of its publication* of its determination and findings pursuant to [EDPL 204]" (emphasis added). On its face, therefore, EDPL 207(A) speaks to the condemnor's "completion" of "its" publication, which is necessarily dependent on the number of days the condemnor chooses to publish the notice. EDPL 207(A) does not measure the statute of limitations from "the" publication or from any specific date of publication, but instead invokes the more flexible concept that the limitations period runs from whatever date the condemnor completes "its" publication, which in this instance is the Village's fifth day of notice on December 19, 2005.

The Village can take no solace from the language of EDPL 207(A) that renders publication "pursuant to" EDPL 204(A). EDPL 204(A) merely requires that the condemnor's notice be published in "at least" two successive issues, which requirement the Village satisfied. However, EDPL 204(A) does not, by its language, prohibit additional publications. Recognizing, as we do, that a purpose of publication is to provide persons with notice of the taking so that judicial review may be invoked, the Village's fifth day of publication represents the "completion of its publication" pursuant to EDPL 207(A). In other words, EDPL 204(A) and 207(A), when read together, fix the statute of limitations as commencing on the second successive day of publication when the condemnor publishes for only a two-day minimum, or, as here, on the date that the condemnor completes its additional successive publications, whichever is later.[FN4]

> FN4. While we do not find the language of EDPL 204(A) and 207(A) to be ambiguous, which would require us to examine the legislation's history and debate (*see* McKinney's Cons. Laws of N.Y., Book 1, Statutes § 92; *Carney v. Philippone,* 1 N.Y.3d 333, 340-342, 774 N.Y.S.2d 106,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

806 N.E.2d 131), we note that an examination of documents maintained by the Legislature sheds no light on the issues before the court.

On a more basic level, this court is compelled to reject the Village's interpretation of EDPL 204(A) and 207(A) as it utilizes the statute as both a sword and a shield. Since the Village voluntarily chose to exceed the minimal notice requirements of EDPL 204(A), it cannot now argue, in an effort to defeat a petition seeking judicial review of the determination and findings, that the minimal notice requirements trigger the running of the statute of limitations. Such an argument defies logic.

**\*235** Consequently, we conclude that since the petition was filed within 30 days from the Village's completion of its publication on December 19, 2005, the instant petition is timely and may be considered on its merits.

### III. *THE NECESSARY "PUBLIC PURPOSE" OF CONDEMNATION*

[6][7] The EDPL was enacted in 1977 and superseded several statutes granting powers of eminent domain to various governmental entities (*see*EDPL 104; *Matter of East Thirteenth St. Community Assn. v. New York State Urban Dev. Corp.,* 84 N.Y.2d 287, 293-294, 617 N.Y.S.2d 706, 641 N.E.2d 1368). Generally, the power of eminent domain, as standardized by the EDPL, may be exercised to take private property as long as there is a legitimate public purpose to the taking (*see* **\*\*135***Vitucci v. New York City School Constr. Auth.,* 289 A.D.2d 479, 480, 735 N.Y.S.2d 560) and "just compensation" is paid to the owners for their properties (U.S. Const., Fifth Amend.; N.Y. Const., art. I, § 7[a]; EDPL 101; *see Walker v. City of Hutchinson,* 352 U.S. 112, 115, 77 S.Ct. 200, 1 L.Ed.2d 178; *Seaboard Air Line R. Co. v. United States,* 261 U.S. 299, 306, 43 S.Ct. 354, 67 L.Ed. 664; *520 E. 81st St. Assoc. v. State of New York,* 99 N.Y.2d 43, 47, 750 N.Y.S.2d 833, 780 N.E.2d 518; *Matter of Town*

*of Islip [Mascioli],* 49 N.Y.2d 354, 360, 426 N.Y.S.2d 220, 402 N.E.2d 1123; *City of Buffalo v. Clement Co.,* 28 N.Y.2d 241, 258-61, 321 N.Y.S.2d 345, 269 N.E.2d 895; *Matter of Village of Port Chester v. Sorto,* 14 A.D.3d 570, 571, 788 N.Y.S.2d 422; *Murphy v. State of New York,* 14 A.D.3d 127, 132, 787 N.Y.S.2d 120).

[8][9][10][11][12] What qualifies as a "public purpose" or "public use" is broadly defined as encompassing virtually any project that may confer upon the public a benefit, utility, or advantage (*see Kelo, supra* at 480, 125 S.Ct. 2655; *Matter of West 41st St. Realty v. New York State Urban Dev. Corp.,* 298 A.D.2d 1, 6, 744 N.Y.S.2d 121,*cert. denied*537 U.S. 1191, 123 S.Ct. 1271, 154 L.Ed.2d 1024; *Vitucci v. New York City School Constr. Auth., supra* at 480, 735 N.Y.S.2d 560). Whether a use to which property is to be devoted by a condemnor is, in fact, for the public benefit is a question to be determined by the courts based on the record (*see Yonkers Community Dev. Agency v. Morris,* 37 N.Y.2d 478, 485, 373 N.Y.S.2d 112, 335 N.E.2d 327; *Fifth Ave. Coach Lines v. City of New York,* 11 N.Y.2d 342, 349, 229 N.Y.S.2d 400, 183 N.E.2d 684; *First Broadcasting Corp. v. City of Syracuse,* 78 A.D.2d 490, 497, 435 N.Y.S.2d 194). While courts are required to be more than "rubber stamps" in determining whether a taking furthers a public use (*Yonkers Community Dev. Agency v. Morris, supra* at 485, 373 N.Y.S.2d 112, 335 N.E.2d 327), a municipality's determination that property is needed for a public purpose is regarded as "well-nigh conclusive" and not a question of fact for de novo determination (*Greenwich Assoc. v. Metropolitan Transp. Auth.,* 152 A.D.2d 216, 221, 548 N.Y.S.2d 190 [internal quotation marks and citation omitted] ). Consequently, the scope of any **\*236** judicial review of condemnation determinations must necessarily be narrow, as the exercise of authority under the EDPL is an essentially legislative function that includes, as a fundamental component, the conduct of a public hearing (*see Matter of West 41st St. Realty v. New York State Urban Dev. Corp., supra* at 6, 744 N.Y.S.2d 121, citing *Kaskel v. Impellitteri,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

44 A.D.3d 226
44 A.D.3d 226, 839 N.Y.S.2d 127, 2007 N.Y. Slip Op. 05506
(Cite as: 44 A.D.3d 226, 839 N.Y.S.2d 127)

Page 10

306 N.Y. 73, 80, 115 N.E.2d 659,*cert. denied,*347 U.S. 934, 74 S.Ct. 629, 98 L.Ed. 1085 and *Matter of New York City Hous. Auth. v. Muller,* 270 N.Y. 333, 339, 1 N.E.2d 153). A legislature's finding that a property condemnation furthers a public use or purpose should be affirmed unless it is "without foundation" in the hearing record (*see Matter of Waldo's, Inc. v. Village of Johnson City,* 74 N.Y.2d 718, 720, 544 N.Y.S.2d 809, 543 N.E.2d 74, quoting *Matter of Jackson v. New York State Urban Dev. Corp.,* 67 N.Y.2d 400, 425, 503 N.Y.S.2d 298, 494 N.E.2d 429; *Matter of Stankevich v. Town of Southold,* 29 A.D.3d 810, 811, 815 N.Y.S.2d 225; *Matter of Keegan v. City of Hudson,* 23 A.D.3d 742, 803 N.Y.S.2d 279; *Matter of Rafferty v. Town of Colonie,* 300 A.D.2d 719, 752 N.Y.S.2d 725; *Matter of West 41st St. Realty v. New York State Urban Dev. Corp., supra* at 6, 744 N.Y.S.2d 121; *Long Is. R.R. Co. v. Long Is. Light. Co.,* 103 A.D.2d 156, 168, 479 N.Y.S.2d 355,*affd.*64 N.Y.2d 1088, 489 N.Y.S.2d 881, 479 N.E.2d 226). The burden of proof is on 49 WB to establish that the municipality's determination and findings do not rationally relate to a conceivable public purpose (*see* **136*Matter of Waldo's, Inc. v. Village of Johnson City, supra* at 720, 544 N.Y.S.2d 809, 543 N.E.2d 74; *Matter of Jackson v. New York State Urban Dev. Corp., supra* at 420-421, 503 N.Y.S.2d 298, 494 N.E.2d 429; *Matter of C/S 12th Ave. LLC v. City of New York,* 32 A.D.3d 1, 11, 815 N.Y.S.2d 516; *Matter of Pfohl v. Village of Sylvan Beach,* 26 A.D.3d 820, 821, 809 N.Y.S.2d 367; *Matter of Molly, Inc. v. County of Onondaga,* 2 A.D.3d 1418, 770 N.Y.S.2d 542; *Matter of Kaufmann's Carousel v. City of Syracuse Indus. Dev. Agency,* 301 A.D.2d 292, 303, 750 N.Y.S.2d 212; *Matter of West 41st St. Realty v. New York State Urban Dev. Corp., supra* at 6, 744 N.Y.S.2d 121; *Matter of Bergen Swamp Preserv. Socy. v. Village of Bergen,* 294 A.D.2d 827, 828, 741 N.Y.S.2d 363; *East Thirteenth St. Community Assn. v. New York State Urban Dev. Corp.,* 189 A.D.2d 352, 359, 595 N.Y.S.2d 961,*affd.*84 N.Y.2d 287, 617 N.Y.S.2d 706, 641 N.E.2d 1368; *Lubelle v. City of Rochester,* 145 A.D.2d 954, 536 N.Y.S.2d 325).

Based upon the foregoing principles, appellate courts have upheld the exercise of eminent domain for a variety of declared public uses. These include, but are not limited to, the taking of land for purposes of urban renewal (*see Matter of Jackson v. New York State Urban Dev. Corp., supra; Matter of Haberman v. City of Long Beach,* 307 A.D.2d 313, 762 N.Y.S.2d 425,*cert. denied*543 U.S. 1086, 125 S.Ct. 1239, 160 L.Ed.2d 896; *Matter of West 41st St. Realty v. New York State Urban Dev. Corp., supra* ), constructing public roadways and intersections (*see* *237*Matter of Waldo's, Inc. v. Village of Johnson City, supra; Matter of Rafferty v. Town of Colonie, supra* at 719, 752 N.Y.S.2d 725; *Matter of Gray v. Town of Oppenheim,* 289 A.D.2d 743, 734 N.Y.S.2d 343; *Matter of Duryea v. Town of E. Hampton,* 172 A.D.2d 752, 569 N.Y.S.2d 139; *Matter of Russin v. Town of Union of Broome County,* 133 A.D.2d 1014, 521 N.Y.S.2d 160; *Kendall v. County of Dutchess,* 130 A.D.2d 461, 514 N.Y.S.2d 1001), maintaining the public shoreline (*see Matter of Pfohl v. Village of Sylvan Beach, supra* ), providing electrical power (*see Matter of Bergen Swamp Preserv. Socy. v. Village of Bergen, supra* ), constructing water tunnels (*see Matter of City of New York [Third Water Tunnel, Shaft 30B],* 18 A.D.3d 342, 795 N.Y.S.2d 229,*affd.*6 N.Y.3d 540, 814 N.Y.S.2d 592, 847 N.E.2d 1166), controlling sewage (*see Matter of Ranauro v. Town of Owasco,* 289 A.D.2d 1089, 735 N.Y.S.2d 332; *Matter of City of Yonkers v. Hvizd,* 93 A.D.2d 887, 461 N.Y.S.2d 408), providing a site for a general hospital (*see Matter of City of New York,* 280 App.Div. 196, 112 N.Y.S.2d 101,*affd.*305 N.Y. 835, 114 N.E.2d 38), expanding airports (*see First Broadcasting Corp. v. City of Syracuse, supra* ), protecting the public from fire damage (*see Matter of Engels v. Village of Potsdam,* 285 A.D.2d 699, 727 N.Y.S.2d 202), providing necessary public parking (*see Salvation Army v. Central Islip Fire Dist.,* 230 A.D.2d 841, 646 N.Y.S.2d 558; *Village Auto Body Works v. Incorporated Vil. of Westbury,* 90 A.D.2d 502, 454 N.Y.S.2d 741; *Matter of Incorporated Vil. of Garden City [Lorentzen],* 15 A.D.2d 513, 222 N.Y.S.2d 413), developing blighted areas (*see Kelo,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

44 A.D.3d 226
44 A.D.3d 226, 839 N.Y.S.2d 127, 2007 N.Y. Slip Op. 05506
(Cite as: 44 A.D.3d 226, 839 N.Y.S.2d 127)

Page 11

*supra; Matter of Murray v. LaGuardia*, 291 N.Y. 320, 52 N.E.2d 884,*cert. denied*321 U.S. 771, 64 S.Ct. 530, 88 L.Ed. 1066; *Matter of City of New York*, 114 N.Y.S.2d 787,*affd.*281 App.Div. 1024, 122 N.Y.S.2d 623), expanding public parks (*see Matter of Woodfield Equities LLC v. Incorporated Vil. of Patchogue*, 28 A.D.3d 488, 813 N.Y.S.2d 184; *Matter of Faith Temple Church v. Town of Brighton*, 17 A.D.3d 1072, 794 N.Y.S.2d 249), and expanding municipal buildings (*see Matter of Stankevich v. Town of Southold, supra* ). **137 Indeed, the exercise of eminent domain has been upheld on appeal for the specific purpose, as relevant here, of providing affordable housing to local residents (*see Pennell v. City of San Jose*, 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1; *Matter of Keegan v. City of Hudson, supra* at 742, 803 N.Y.S.2d 279; accord *East Thirteenth St. Community Assn. v. New York State Urban Dev. Corp., supra* ).

Challenges to the exercise of eminent domain are litigated on varied grounds, including the applicability of exemptions to public hearing requirements (*see*EDPL 206; *Matter of Sanitation Garage Brooklyn Dists. 3 and 3A*, 32 A.D.3d 1031, 822 N.Y.S.2d 97; *Matter of City of Albany*, 9 A.D.3d 551, 779 N.Y.S.2d 632; *Matter of Spittler v. Town of Hamburg*, 4 A.D.3d 735, 771 N.Y.S.2d 464), compliance with SEQRA (*see Matter of C/S 12th Ave. LLC v. City of New York, supra; Matter of Stankevich v. Town of Southold, supra;* *238*Matter of Woodfield Equities v. Incorporated Vil. of Patchogue, supra* ), and the adequacy of compensation in exchange for the condemned property (*see*EDPL 303, 304; *Matter of City of New York v. Mobil Oil Corp.*, 12 A.D.3d 77, 783 N.Y.S.2d 75; *Matter of Molly, Inc. v. County of Onondaga, supra; ERA Realty v. State of New York*, 281 A.D.2d 388, 721 N.Y.S.2d 273; *Pritchard v. Ontario County Indus. Dev. Agency*, 248 A.D.2d 974, 669 N.Y.S.2d 1004).

[13][14] Where, as here, "public use" is specifically at issue, challenges to the condemnation fall into two broad categories; namely, public versus private

benefits to be realized from the taking, and the condemnor's good versus bad faith. The first category is often disputed in reported cases. Eminent domain cannot be used as a mere pretext for conferring benefits upon purely private entities and persons (*see e.g., Kelo, supra* at 478, 125 S.Ct. 2655; *Matter of Woodfield Equities v. Incorporated Vil. of Patchogue, supra* at 489, 813 N.Y.S.2d 184). The existence of a public use, benefit, or purpose underlying a condemnation is a sine qua non to petitions under EDPL 207. Nonetheless, the fact that an intended public use confers incidental benefit to private persons or entities will not invalidate the condemnation of private property (*see Kelo, supra*, at 478, 125 S.Ct. 2655; *Matter of Waldo's, Inc. v. Village of Johnson City, supra* at 721, 544 N.Y.S.2d 809, 543 N.E.2d 74; *Yonkers Community Dev. Agency v. Morris, supra* at 482–483, 373 N.Y.S.2d 112, 335 N.E.2d 327; *Matter of West 41st St. Realty v. New York State Urban Dev. Corp., supra* at 6, 744 N.Y.S.2d 121; *Vitucci v. New York City School Constr. Auth., supra* at 481, 735 N.Y.S.2d 560; *Matter of Duryea v. Town of E. Hampton, supra* at 752, 569 N.Y.S.2d 139; *Rodrigues v. Town of Beekman*, 120 A.D.2d 724, 502 N.Y.S.2d 778; *Matter of Terrace W. v. City of Plattsburgh*, 73 A.D.2d 763, 423 N.Y.S.2d 296; *Evans v. State of New York*, 34 A.D.2d 1007, 1008, 312 N.Y.S.2d 821,*affd.*28 N.Y.2d 844, 322 N.Y.S.2d 75, 270 N.E.2d 900; *Ross v. State of New York*, 30 A.D.2d 681, 291 N.Y.S.2d 926,*affd.*23 N.Y.2d 807, 297 N.Y.S.2d 309, 244 N.E.2d 877; *Matter of Northeast Parent & Child Socy. v. City of Schenectady Indus. Dev. Agency*, 114 A.D.2d 741, 742, 494 N.Y.S.2d 503; *Matter of Incorporated Vil. of Garden City [Lorentzen], supra* at 513, 222 N.Y.S.2d 413). 49 WB alleges, and the Village denies, that the sole beneficiaries of the challenged condemnation are HOGAR, which obtains title to the Graziosi Building it has sought unsuccessfully to purchase in the past, and Ginsburg, which allegedly is credited toward its contractual affordable housing obligation with the 16 affordable units that are to be constructed by HOGAR.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**138 [15] A second, less frequent basis for challenging a condemnation, also at issue here, is the alleged bad faith of the condemnor (*see e.g. Matter of Woodfield Equities LLC v. Incorporated Vil. of Patchogue, supra;* *239Matter of Faith Temple Church v. Town of Brighton, supra; Matter of Ranauro v. Town of Owasco, supra* at 1090, 735 N.Y.S.2d 332; *Village Auto Body Works v. Incorporated Vil. of Westbury, supra* at 742-743). Bad faith is a concept separate and distinguishable from pretextual condemnations. Cases involving bad faith address procedural violations allegedly committed by municipalities resulting in condemnations that serve a legitimate public purpose (*see e.g. Matter of Faith Temple Church v. Town of Brighton, supra; Matter of Ranauro v. Town of Owasco, supra* ). Bad faith arguments have also been made in cases where the property owner challenges the selection of its property for condemnation (*see e.g., Village Auto Body Works v. Incorporated Vil. of Westbury, supra* ). Petitioners face significant hurdles in challenging condemnations based on alleged bad faith. There must be a "clear showing" in the record of bad faith (*see Matter of Faith Temple Church v. Town of Brighton, supra* at 1072, 794 N.Y.S.2d 249; *Village Auto Body Works v. Incorporated Vil. of Westbury, supra* at 502, 454 N.Y.S.2d 741), and mere allegations of bad faith and suspicious timing, such as those alleged by 49 WB here,[FN5] do not suffice (*see Matter of Woodfield Equities LLC v. Incorporated Vil. of Patchogue, supra* at 488, 813 N.Y.S.2d 184; *Matter of Faith Temple Church v. Town of Brighton, supra* at 1073, 794 N.Y.S.2d 249). Absent a viable petition as to the Village's "bad faith," our determination must pivot upon whether 49 WB is able to establish, as is its burden, that the Village's determination and findings do not rationally relate to a conceivable public use, benefit, or purpose, or whether it merely confers private benefits to third parties.

     FN5. 49 WB alleges bad faith on the part of the Village by the suspicious timing of the first notice of the condemnation hearing, 11 days after its purchase of the Grazi-

osi Building; by the "clouding" of marketable title from a history of condemnation proceedings that had been commenced against the Graziosi Building and then discontinued; and by the Village's admission that it had no use for the property itself other than for HOGAR to fully finance its acquisition and for title to then be immediately transferred by the Village to HOG- AR.

EDPL 207(C) specifically provides that upon review of a petition filed pursuant to the statute, the Appellate Division shall either confirm or reject the condemnor's determination and findings, with the scope of the review limited to whether:

    (1) the proceeding was in conformity with federal and state constitutions;

    (2) the proposed acquisition is within the condemnor's statutory jurisdiction or authority;

    (3) the proposed condemnor's determination and findings were made in accordance with statutory procedures; and

    *240 (4) the proposed acquisition serves a public use, benefit or purpose.

We find no flaw in the determination and findings with respect to the consideration required by EDPL 207(C)(1), (2), and (3). The proceedings honored the parties' rights to notice and due process, were within the Village's eminent domain jurisdiction, and followed the statutory procedures of EDPL article 2. However, on this record, and recognizing the deference that is to be afforded to legislative findings, we find flaws in the condemnor's determination and findings under EDPL 207(C)(4) that a public use, benefit, or purpose would **139 be served by the Village's acquisition of the Graziosi Building.

More specifically, the determination and findings incorrectly conclude that the "public purpose" requirement of the EDPL is satisfied in three ways:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

44 A.D.3d 226
44 A.D.3d 226, 839 N.Y.S.2d 127, 2007 N.Y. Slip Op. 05506
(Cite as: 44 A.D.3d 226, 839 N.Y.S.2d 127)

203), the rendering of the determination and findings and the publishing of notice thereof (*see*EDPL 204, 207[A] ), and the right of judicial review (*see*EDPL 207). EDPL articles 4 through 6 define the proceedings that must later be commenced to vest the condemnor with title to the condemned property. The articles include a statute of limitations (*see*EDPL 401[A] ), the filing of acquisition maps with notice to the condemnees (*see*EDPL 402[A] ), rules regarding judicial jurisdiction (*see*EDPL 501), venue (*see*EDPL 402[B] ), pleadings (*see*EDPL 402[B] [3] and [4], 504, 507), the filing and service of the claims (*see*EDPL 502, 503), litigation procedures (*see*EDPL 506, 508, 509, 510, 511), methods of dispositions (*see*EDPL 402[B][5], 512, 513), the abandonment of acquisitions by condemnors (*see*EDPL 406, 702[B] ), and appeals (*see*EDPL 514[C] and [D], 604).

The "two-step" process set forth in the EDPL was recognized and discussed by the Court of Appeals in *Matter of City of New York [Grand Lafayette Props. LLC]*, 6 N.Y.3d 540, 814 N.Y.S.2d 592, 847 N.E.2d 1166, *supra*. The Court of Appeals discussed the first step as the process by which a determination is made by the condemnor to condemn property, followed by a separate "vesting proceeding" to transfer title in the property from the condemnee to the condemnor (*id.* at 543, 814 N.Y.S.2d 592, 847 N.E.2d 1166). On this record, only the first of the two steps has been undertaken by the Village.

EDPL 702(B) authorizes an award to a condemnee of reasonable fees for attorneys, appraisers, and experts, plus costs and disbursements. The plain language of the statute limits any such award, however, to circumstances where the condemnor has "abandoned" efforts to acquire the **143 property, or where the court determines that the condemnor was "not legally authorized to acquire the property." Significantly, any award of fees, costs, and disbursements are those actually incurred because of the "acquisition procedure" (*see*EDPL 702 [B] ).

The operative word of the statute is "acquisition." Acquisition is separately defined by EDPL 103(A) as "the act of vesting of title, right or interest to, real property for a public use, benefit or purpose, by virtue of the condemnor's exercise of the power of eminent domain." The "acquisition procedure" of EDPL 702(B) that permits an award of fees under circumstances of abandonment or lack of authority is therefore a reference to the "second step" of eminent domain, when the condemnor seeks to vest title in condemned property (*see*EDPL 103[A]; *accord Matter of City of New York [Grand Lafayette Props. LLC]*, *supra* at 543, 814 N.Y.S.2d 592, 847 N.E.2d 1166). Here, the Village has commenced no *246 vesting proceeding under EDPL articles 4 through 6 to obtain legal title to the Graziosi Building. Having commenced no such proceeding, it has "abandoned" no vesting rights envisioned by EDPL 406 and 702(B). Additionally, the Village has not been found within the context of a judicial "vesting proceeding" to be unauthorized to acquire the property. This Court's holding that the Village's condemnation of the Graziosi Building serves no public purpose falls under the threshold "first step" condemnation process (*see*EDPL article 2) for which an award of fees is not statutorily authorized in favor of the condemnee. It is not within the scope of the "second step" acquisition procedures (*see*EDPL articles 4 through 6) in which fees may be awarded.

Accordingly, by construction of the plain language of EDPL 103(A) and 702(B), the petitioner, 49 WB, is not entitled to an award of attorneys' fees, costs, and disbursements, notwithstanding this court's finding in its favor on the merits of the petition.

The parties' remaining contentions are without merit or have been rendered academic by our determination.

In sum, the petition is granted, on the law, to the extent of annulling the Village's determination and findings authorizing condemnation of the subject property, and the petition is otherwise denied.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

44 A.D.3d 226
44 A.D.3d 226, 839 N.Y.S.2d 127, 2007 N.Y. Slip Op. 05506
**(Cite as: 44 A.D.3d 226, 839 N.Y.S.2d 127)**

ADJUDGED that the petition is granted, on the law, with costs, to the extent of annulling the determination of the Board of Trustees of the Village of Haverstraw dated November 29, 2005, and the petition is otherwise denied.

MILLER, J.P., SPOLZINO, and FISHER, JJ., concur.

N.Y.A.D. 2 Dept.,2007.
49 WB, LLC v. Village of Haverstraw
44 A.D.3d 226, 839 N.Y.S.2d 127, 2007 N.Y. Slip Op. 05506

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.